Barry D. Einsig, an individual, Petitioner *v.* Pennsylvania Mines Corporation et al., Respondents.

352

Argued October 5, 1982, before President Judge CRUMLISH, JR. and Judges WILLIAMS, JR., CRAIG, MAC-PHAIL and DOYLE.

*Timothy E. Durant*, with him *John A. Ayres, Jr.*, for petitioner.

*Richard DiSalle*, with him *Henry McC. Ingram*, and *R. Henry Moore*, and *Rose, Schmidt, Dixon & Hasley*, for respondent, Pennsylvania Mines Corporation.

*Justina M. Wasicek*, with her *Joseph T. Kosek, Jr.*, for respondent, Pennsylvania Department of Environmental Resources.

OPINION BY JUDGE WILLIAMS, JR., October 18, 1982:
This case comes before the Court on an appeal by Barry Einsig, the lessee of rights to drill for oil and gas, from a decision of the Environmental Hearing Board (Board) which revoked a permit to drill granted to Einsig by the Department of Environmental Resources (DER). The permit would have allowed Einsig to drill a well, at a specified location, through a coal mine owned by the Pennsylvania Mines Corporation (PMC).

I. BACKGROUND

By deed dated September 26, 1973, Greenwich Collieries Company, a division of PMC, received "all coal and mining rights" to approximately 12,224 acres in Indiana County, Pennsylvania. The conveyance excepted and reserved to the grantor

the surface of said tract, oil and gas, and the right to drill through said coal for oil and gas without liability for coal required to be left unmined around said hole or well for its support and protection.

On January 6, 1982, Harmony Gas and Oil, by its president, Barry Einsig, entered into an oil and gas lease with one Norman Gardner, by which it acquired the rights to drill for oil and gas and to hold "all other rights and privileges necessary, incident to or convenient for the operation" of the said lease. The grant of a two-year term for one acre of land (the Gardner Site) is subject to the actual commencement of drilling activities by January 6, 1984.[1] The Gardner site is located over a portion of the PMC tract referred to, *supra,* known as the Upper Freeport Mining Area, which comprises twenty-nine hundred acres in Indiana County.

Prior to drilling, Einsig was required by law to obtain a permit from the Division of Oil and Gas of DER. *See* Section 201 of the Gas Operations Well-Drilling Petroleum and Coal Mining Act, Act of November 30, 1955, P.L. 765, *as amended,* 52 P.S. §2201 (Act). Pursuant to the terms thereof, Einsig applied for the permit, and provided DER with the requisite information concerning the location of the proposed well and the names of the owner and/or lessee of the surface and "all known underlying coal seams." 52 P.S. §2201(a). DER then contacted those entities, and PMC promptly registered its objections to the issuance of the permit. The protests were submitted in accordance with 52 P.S. §2202(a),

---

[1] The urgency of this matter is related to the lease on a contiguous property which will expire on October 22, 1982, unless a well has been dug. Surface structure requirements necessitate the maintenance of the two tracts as a single unit, and the loss of one impairs the viability of the drilling effort.

which grants to any coal owner or operator the right to file objections to the application if he believes that "the well when drilled or the pillar of coal about the well[2] will . . . unduly interfere with or endanger" the mine (footnote added). PMC's vigorous disapproval was pointedly directed at the "offset" nature of the Gardner site well.

The tract at issue, the Upper Freeport Mining Area, had over one hundred wells on and through it when Einsig received a permit to drill a previous well, known as the Yeager well.[3] Both that well and the proposed Gardner site well are "offset" in that each is, or is proposed to be, drilled at a distance of less than 1,000 feet[4] from the nearest existing wells. PMC contends that it has not challenged the issuance

---

[2] The "pillar of coal" is a solid block of coal which must be left intact surrounding the well. 52 P.S. §2203 states that the pillar need not be more than one hundred feet in radius unless unusual conditions exist which might require a larger pillar of up to 150 feet in radius.

[3] Litigation was commenced on the Yeager well permit, but when the Board declined to issue a supersedeas pending its decision on the merits of the issuance of that permit, Einsig drilled. That litigation is still active, although relief can apparently now be obtained only by an action for damages.

[4] The term "offset" is used by all parties to characterize the Yeager and Gardner wells. It cannot be found in either the Act or any existing DER regulations. The definition of "offset" was created by the Board for this decision, insofar as the Court is aware, and serves the useful function of distinguishing between those wells spaced on 1000 foot centers, and those which are not. The record indicates, and the Board found that the other wells are so spaced because there exists an informal agreement between an association of coal mining companies and an association of well-drillers, in which the drillers agreed to drill on 1000 foot centers. The effect of the agreement is to allow drillers to obtain permits pursuant to the Act without challenge by the coal industry, if the wells are spaced at least 1000 feet apart. There is other testimony in the record which indicates the clear preference of PMC's wit-

of permits for the 112 non-offset wells because it can mine around them in a manner that it considers to be feasible from both economic and safety perspectives, but that offset wells unduly interfere with and/or endanger the mine.

After a DER conference[5] attended by Einsig and representatives of PMC, Einsig relocated the proposed well in an attempt to accommodate some of PMC's objections.

It was noted at argument before this Court that PMC actually chose the site of the proposed well, as being that spot on Einsig's tract where it would least interfere with the recovery of coal. At that location, the pillar surrounding the well can be incorporated with a coal barrier PMC has to leave around a "sump"[6] which it intends to construct. The result will "minimize coal loss," in the words of PMC's Chief Mining Engineer.

Perceiving that the maximum accommodation possible under the circumstances[7] had been made by Einsig, DER issued the permit. PMC thereupon filed an appeal of that decision to the Board. After some procedural intricacies not relevant to our review of

---

nesses that the wells be on 1000 foot centers—see the testimony of Mr. Connors, an elected official of District No. 5 of the United Mine Workers, of Mr. Tisdale, Vice-president of PMC, and of Mr. Yonkoske, PMC's Chief Mining Engineer.

[5] The DER conference is mandated by 52 P.S. §2202(b).

[6] A "sump" is defined in the adjudication as "a reservoir where underground water can be collected and stored, and from which the water can eventually be pumped out." Finding of Fact No. 51 explains that "Construction of the sump involves leaving barrier pillars of unmined coal in the seam."

[7] The Gardner site is small, and re-locating the well to the very edge of the property did not resolve the offset issue, particularly since moving farther from one of the surrounding wells simply places it closer to another.

this matter, the Board determined that the issuance of the permit constituted an abuse of discretion on the part of DER, and voided the permit.[8]

## II. DISCUSSION

The Board adjudication contains sixty-nine findings of fact, twenty-one of which Einsig challenges under various legal theories in his Petition for Review. The Board's analysis of the law as applied to the findings centered upon the statutory language which directs DER to issue a permit for that location where the well can be safely drilled without "unduly interfering with or endangering" the mine, since the appeal taken by PMC was specifically addressed to the interpretation of that wording. PMC argued that the words, "unduly interfere with," should be analyzed in light of the economic impact of the well on the mine, asserting that if the existence of a well would make the recovery of the coal economically unfeasible to the coal miner, then the well would "unduly interfere with" the mine. It proposed that if the mine operator can demonstrate either safety or economic factors which satisfy what it perceives as the statutory standard, then DER should deny the permit to the well-driller.

---

[8] The Board included in the early pages of its extensive opinion a strong caveat, by which it warns that the numerous procedural deficiencies in the record of this case preclude its meriting any collateral estoppel effect, should some future drilling contest appear to warrant same. In an effort to avoid the result obtained in the Yeager well litigation, See Note 3, the parties waived discovery and an exchange of pre-hearing memoranda, and the Board waived the benefit of the same pre-hearing memoranda, as well as deficiencies in post-hearing briefs. Furthermore, the Board was required by the time constraints of the matter, to issue its adjudication without having an opportunity to question witnesses itself, or to have a transcription of the argument made to it subsequent to the hearing.

DER, which has maintained a relatively neutral position in this proceeding, offered a different characterization of its role in issuing permits under the Act. It construed the language of Section 203(f) of the Act, 52 P.S. §2203(f)[9] as indicative of a legislative intent that DER remain neutral in an economic dispute between a well-driller and a coal operator. It interprets the wording of Section 203(f) as a directive that the statute *not* be used to affect any financial rights in such a dispute. It concludes that since the wording of Section 203(f) prohibited use of the Act to affect contract rights existing at the time of its passage, the Act should not be used at all to alter any contract rights from which damages would logically flow. DER maintains that it is not authorized to act in that judicial capacity required of the entity which makes a decision, in a situation governed by deed or contract, to restrict a person's recovery of those damages which flow from contract rights.

This Court has often noted that

the construction of a statute by those charged with its execution and application is entitled to great weight and should not be disregarded or overturned except for cogent reasons, and un-

---

[9] 52 P.S. §2203(f) states that:

(f) Nothing in this act shall be construed to require a well operator to pay for any coal pillar required by the act to be left around any well drilled prior to the effective date of this act. Nothing contained in this act, which may require a coal operator to leave a pillar of coal of a certain size around a well drilled after the effective date of this act, shall in any way affect (1) any right which the coal operator would have had prior to the effective date of this act to obtain payment for such coal nor (2) any duty or right which the well operator, storage operator or land owner may have had prior to the effective date of this act to pay for or not to pay for such coal.

less it is clear that such construction is erroneous.

*Spicer v. Department of Public Welfare,* 58 Pa. Commonwealth Ct. 558, 560, 428 A.2d 1008, 1009 (1981), quoting *Longo Liquor License Case,* 183 Pa. Superior Ct. 504, 508, 132 A.2d 899, 901 (1957). However, before we address the accuracy of DER's interpretation of the Act, we shall examine the adjudication itself.

The crux of the Board's decision was the formulation of a "test (which) reasonably embodies the Legislature's intent when it enacted 52 P.S. §2202 (b)." (Adjudication, p. 29). In that test the Board determined that if a well was "offset," *i.e.,* less than 1000 feet from the next well, it

[W]ill unduly interfere with or endanger the mine if:

a. As a direct result of drilling the well, in order to comply with safety or other regulations, there will become unmineable or impractically expensive to mine, by every commonly employed mining method, including room and pillar, an amount of coal significantly (more than de minimis) greater than the amount of coal that similarly would have become unmineable, or impractically expensive to mine, had the well been drilled at least 1,000 feet from any already existing wells, provided that

b. The mine possesses a "workable coal seam" as defined in 52 P.S. 2102(4).

52 P.S. §2102(4) states:

"Workable coal seam" means (i) a coal seam in fact being mined in the area in question under this act by underground methods or (ii) one which in the judgment of the division

can be and that it is reasonable to be expected will be mined by underground methods.

At this time we will assume, without deciding, that the test is legally acceptable.

Referring to 25 Pa. Code §21.101, the Board correctly determined that PMC as the party appealing an action of DER, had the burden of proving that the Gardner well would unduly interfere with or endanger the mine. In order to do so, under the enunciated test, PMC had to prove that the "offet" nature of the well would cause "an amount of coal significantly (more than de minimis) greater than the amount of coal" that would have become unmineable if the well were more than 1000 feet from its neighbor, to become "unmineable, or impractically expensive to mine. ..." In other words:

(1) By statute each well must be surrounded by a pillar of coal which, according to testimony, generally contains approximately 8,000 tons.

(2) If it is proven that the offset nature of the well will cause more than that 8,000 tons of coal to be rendered unmineable, or impractically expensive to mine, *and* the additional amount is proven to be more than de minimis, then DER should not issue the permit because the well will unduly interfere with or endanger the mine.

The Board determined that PMC had proven this, thus carrying its burden, and that the burden then shifted to Einsig or to DER (which asserts that it has no interest in the matter) to prove that a condition exists which would mitigate the effect of the offset character of the well—in this case the previously mentioned sump which will share a common wall of coal with the proposed well. By Department guidelines, the sump must also be surrounded by a barrier of coal to prevent water from leaking into the mine.

The Board reasoned that since "neither DER nor Einsig presented any evidence of their own on the effects of the sump" (Adjudication, p. 28), PMC was entitled to the requested relief.

This Court does not perceive that the findings made by the Board lead to that legal conclusion. Our scope of review in reviewing a determination of the Board is limited to an examination of the record to ascertain whether the findings are supported by substantial evidence, whether the Board committed an error of law, or whether the constitutional rights of the parties have been violated. 2 Pa. C. S. §704. Although our review of the record indicates that all contested findings are supported by substantial evidence,[10] we also opine that they do not, as a matter of law and logic, lead to the conclusions reached by the Board.

Specifically, Finding No. 66 states that "[n]o clear evidence on the nature or amount of the added costs that might be associated with the offset character of the Gardner Well was introduced into the record." Finding No. 67 states that "[t]he record does not show any quantitative estimates of the extra coal which would become unmineable because of the offset character of the Gardner Well." If there is inadequate evidence to establish the amount of coal which the Gardner well will render unmineable, and insufficient evidence to establish the additional costs, then it cannot be said that that unknown amount is "significant (more than de minimis)." The characterization is being made in a void. It is clear error to assert that PMC established either that the amount of additional coal was significant, or that the said coal

---

[10] In this instance, where some of the findings relate to a dearth of evidence, a more precise statement might be that the findings accurately reflect the state of the record.

became impractically expensive to mine, with "no quantitative estimates" relative to the first criterion, and "no clear evidence" to establish the second.

We therefore find that the record, which supports the findings of fact by which we are bound, does not support the conclusion that the well will unduly interfere with or endanger the mine. Because the decision in this case may have substantial ramifications in the coal and oil industries, however, we shall now address other issues raised by the parties.

As previously noted, this Court is strongly guided in statutory interpretation by the agency charged with the "execution and application" of that law. In this instance DER is the agency so charged, and its interpretation was discussed, *supra*.

The Court is also governed, however, by the legal tenet that "[s]tatutes are never presumed to make any innovation in the rules and principles of the common law or prior existing law beyond what is expressly declared in their provisions. . . ." *Rahn v. Hess,* 378 Pa. 264, 270, 106 A.2d 461, 464 (1954). *See* Statutory Construction Act of 1972, 1 Pa. C. S. §1921.

PMC asserts that the Act was the legislative response to a need for statutory delimitation of a developing technical field in which property rights in various stratified estates infringed upon one another. It cites what it and we perceive as the controlling statement of pre-Act common law for our perusal, *Chartiers Block Coal Company v. Mellon,* 152 Pa. 286 (1893). In that case the plaintiff/appellant was the owner of the coal, and wished to enjoin the surface owner, or his lessees, from drilling through the coal to the subjacent oil-bearing sands. Chartiers alleged that Mellon had no right to drill the wells, since his (Chartiers') grantor had

reserved to himself no right, privilege or easement in said coal, or any part thereof, and no right of way through said coal from the surface to obtain gas and oil. . . .

*Id.* at 292, and if the grantor had not excepted such rights to himself, he could not transfer them to any other party. Plaintiff further asserted that the drilling would render

the mine operations so hazardous to plaintiff's property and plaintiff's employees as to very greatly injure and depreciate the value of said coal property, if not wholly to destroy the value thereof.

*Id.* at 293. The Allegheny County Court of Common Pleas granted the injunction "restraining and enjoining the defendant . . . from drilling any well . . . which will pass into or through the Pittsburgh vein," but refused to enjoin the use of those wells which were already drilled or the drilling of wells on the tract at any point where they would "not pass through said Pittsburgh vein or coal, but will pass through lower strata of coal." *Id.* at 288-89. It then ordered, *inter alia,* that Mellon deposit with the court a bond

conditioned that in putting down and operating any wells . . . said defendant shall protect said coal and property of said plaintiff, and also plaintiff's employees in and about said coal from all damages by reason of said wells. . . .

*Id.* The final language of the order dealt with plugging procedures prior to abandonment. The holding was based on a theory of right of way by necessity to the submerged estate, limited by a judicious balancing of the "interests and rights of both parties." *Id.* at 294.

The wording of the trial court order construed in conjunction with the language of the Pennsylvania

Supreme Court affirmance of it constitutes a clear parallel to the provisions of the Act. The Court noted that the right to mine for coal

> is a right to be exercised with due regard to the owner of the surface, and its exercise will be restrained, within proper limits, by a court of equity if this becomes necessary; but subject to this limitation it is a right growing out of the contract of sale, the position of the stratum sold, and the impossibility of reaching it in any other manner.

*Id.* at 296. In analogizing that estate to the ownership of oil, the Court opined that if the owner of the oil "is denied the means of access to it he is literally deprived of an estate which he has never parted with," but it noted that he "should not be permitted at his mere whim and pleasure to interfere with strata lying above him." *Id.* at 298. His right to drill through the coal to reach the oil

> may be suspended during the operation of the removal of the coal *to the extent of preventing any wanton interference* with the coal mining, and for every necessary interference with it the surface owner must respond in damages. (Emphasis added.)

*Id.* at 297. The court refused to concern itself with the questions of "how that right shall be exercised, by what authority, and under what limitations," *Id.*, and referred the resolution of those dilemmas to the legislature. Some fifty-odd years later, the legislature passed the Act, which addressed those very concerns.

Both *Chartiers* and the Act leave the reader with certain definite impressions:

(1) The drilling of any well constitutes interference—*Chartiers* distinguishes between "wanton" in-

terference, which will be prevented by the interception of equity, and "necessary" interference, for which the driller must respond in damages. The Act, by restricting "undue" interference, acknowledges the existence of some lesser type, which we can call "due" for the sake of convenience.

(2) The rights of the parties must be balanced— *Chartiers* so states. The Act infers the weighing process by directing that both parties' wishes must be heard, and that the issuance of the permit shall not occur until both parties have made their positions known to the agency.

(3) Rights other than those regulated by the Act exist between the parties—*Chartiers* refers to them as "growing out of a contract of sale," the Act discusses them in Section 203(f), as previously noted.

(4) If the parties fail to agree on a suitable location, it becomes necessary that a proper authority impose upon them its determination of *where* (not whether) the appropriate location shall be—*Chartiers* relies on the court of equity. The Act gives that authority to DER in Section 202(b), 52 P.S. §2202(b).[11]

Since there are no provisions in the Act which expressly declare that it is to be construed in derogation

---

[11] 52 P.S. §2202(b) states, in pertinent part;

If they fail to agree upon a location, the division . . . shall, by an appropriate order, determine a location on such tract of land as near to the original location as possible where, in the judgment of the division, the well can be safely drilled without unduly interfering with or endangering such mine. Such new location as agreed upon by said parties or as determined by the division shall be indicated on the plat on file with the division and shall become a permanent record, whereupon the division shall promptly issue a drilling permit authorizing the well operator to drill at the location agreed upon by the parties or as determined by the division.

of the common law, *Rahn, supra,* and since our discussion leads to the logical conclusion that *Chartiers* can be found to be a judicial declaration of the pre-Act common law, we may be guided to the maximum extent possible by *Chartiers'* language in construing the Act.

It is not likely that the *Chartiers* court envisioned the proliferation of regulatory agencies in the executive branch of government in the fifty-nine years between its opinion and the passage of the Act. Where, in the pre-DER days, a court of equity could have acted to prevent "wanton" interference with a coal mine by a driller, the Act has empowered DER to prevent "undue" interference with the mine. Damages caused by "necessary" interferences, limited perforce by the language of deeds and the "contract of sale," are actually mitigated, in our regulatory framework, by the application of the expertise of DER in locating the proposed well "as near to the original location as possible where, in (its) judgment, the well can be safely drilled without unduly interfering with or endangering said mine." 52 P.S. §2202(b). PMC contends that in addition to locating the well, DER should balance the financial interests of the two parties, to the extent of denying the permit to drill if the financial impact on the mine is too severe.

Relative to this argument, DER asserts that it does not have the statutory authority to weigh the competing private interests of Einsig and PMC, and that without such authority, it cannot decide which property owner will prevail from a purely financial perspective. *See* Section 202(b) of the Act, 52 P.S. §2202(b), which states that if the parties "fail to agree upon a location" for the well, DER *shall,* by an appropriate order, determine the appropriate location. This Court noted in *Pittsburgh Milk Market-*

*ing Board Appeals,* 7 Pa. Commonwealth Ct. 180, 187, 299 A.2d 197, 200 (1973):

Administrative agencies in this Commonwealth have only those powers and authority granted to them by the Legislature. Regulatory agencies can do no more than the law permits.

DER offers to submit to whatever this Court or the Board directs it to do, in spite of its opinion that it does not have the authority to balance the competing interests. This attitude paints the powers of the Board, and indeed of this Court, with an overly broad brush. In this context the job of the judiciary is to interpret, not to legislate. We may liberally construe those powers given to DER by the legislature, but we cannot add to them. The question to be resolved is whether the pertinent statute grants DER the power to examine the relative financial impact of the issuance or refusal of the permit.

Among the cases in which this Court has addressed the question of DER's examination of economic impact are: (1) *Bortz Coal Co. v. Department of Environmental Resources,* 7 Pa. Commonwealth Ct. 362, 299 A.2d 670 (1973), which was an appeal from an order of DER directing Bortz to regulate the emissions for its beehive coke ovens to such an extent that they do not violate the provisions of the Air Pollution Control Act; (2) *Department of Environmental Resources v. Borough of Carlisle,* 16 Pa. Commonwealth Ct. 341, 330 A.2d 293 (1974), which was an appeal by the affected sewage authority and municipality from a Board adjudication imposing limitations on new connections to the municipal sewage system; and (3) *Rochez Brothers, Inc. v. Department of Environmental Resources,* 18 Pa. Commonwealth Ct. 137, 334 A.2d 790 (1975), an appeal from an order refusing Rochez permission to reactivate its beehive coke ovens.

Footnote 8 in *Rochez* accurately reflects what a collective reading of the three cases establishes.

> [I]n situations, such as the instant case, where the language of the Act is mandatory, DER must enforce the mandatory provision regardless of the economic consequences. If, however, the Act gives DER discretionary authority to act, i.e., setting up timetables, levying fines, granting waiver, etc., we believe DER must consider the economic impact of its actions.

*Id.* at 149, 334 A.2d at 797. It is important to note, however, that these cases are clearly distinguishable from the one *sub judice* in a highly relevant particular. They do not require a balancing of the economic impact of the DER order on *competing private* interests. All they apply to are the economic effects on an industry which must comply with a DER order, where that industry is appealing the order. They point out that where the language of the relevant act permits, DER can adjust its order in some fashion to accommodate what might otherwise be a harsh economic impact on the company, balancing it only against such factors as the interests of the community, or the economic impact on the citizenry, or the environmental impact on the Commonwealth. The Act presently before us does not offer DER the flexibility that was available in the above cases, and does not contain any language which would broaden its duties to even permit it to interpose itself in a financial dispute involving private industry.

We therefore hold that DER cannot issue or deny a permit upon consideration of which entity, the mining company or the well-driller, will be more financially harmed, or proportionately more financially harmed, once it has determined that the well may be safely drilled.

Having made that threshold decision, DER is empowered by the Act only to decide upon the location on the tract where the well will not unduly interfere with or endanger the mine. In a location other than that place where the effect on the mine is least significant, a well will *unduly* interfere with or endanger the said mine, and DER is ordered by the mandatory language of the Act to ascertain where that location is, and to issue a permit therefor. Were the well driller to drill in a position other than that chosen by the parties, or by DER in the application of its environmental expertise, he would be "unduly" interfering with or endangering the mine.

It is not contested by the parties, and indeed is acknowledged by the language of the Act, that any well will interfere with or endanger any mine to some degree. Because of the very existence of the wells, the miners must take additional safety precautions relative to ventilation, structural supports, and gas seepage into the mine. What is contested here is an interpretation of the Act which will, in many instances, render the Act confiscatory in its application.

The effect of the Board's decision would be to render Einsig's estate in the land, the right to drill for oil and gas, non-existent. *See Alco Parking Corporation v. Pittsburgh,* 453 Pa. 245, 269, 307 A.2d 851, 864 (1973) :[12]

> Traditionally governmental activities held to be unconstitutional takings of property without due process of law are restricted, for example, to the realm of zoning and eminent domain. However, no reason has been suggested why unconstitutional takings must necessarily be restricted only to this segment of the law. In-

---

[12] Reversed on other grounds at *Pittsburgh v. Alco Parking Corporation,* 417 U.S. 369 (1974).

deed, this Court has held that "a 'taking' is not limited to an actual physical possession or seizure of the property; if the *effect* of the . . . regulation is to deprive a property owner of the lawful use of his property it amounts to a 'taking,' for which he must be justly compensated:" Cleaver v. Board of Adjustment, 414 Pa. 367, 372, 200 A.2d 408 (1964). . . . (Emphasis in original.)

As here interpreted, the Act will deprive Einsig of the lawful use of his property, *i.e.* the ability to drill for oil and gas.

The Statutory Construction Act lists among its directives to the Court " [t]hat the General Assembly does not intend to violate the Constitution." 1 Pa. C. S. §1922(3). Our obligation, therefore, is to ascertain whether the statutory language can be construed in a manner which is consistent with the preservation of those rights protected by the Constitution. The Board's interpretation does not meet that criterion, and we conclude that it is not in keeping with the Legislative intent. If we construe the Act so that its meaning parallels the decision in *Chartiers,* we can say that the owner of the oil and gas rights, Einsig, has the right to drill through the coal, limited only by (1) any rights and/or duties emanating from his contract of sale, (2) safety considerations, and (3) the power of DER to restrain his "undue" interference with or endangerment of the mine. Both Numbers 2 and 3 above are within the purview of DER to regulate.

Concerning Number 1 above, Einsig directs the attention of the Court to *Pennsylvania Coal Company v. Mahon,* 260 U.S. 393 (1922), in which the United States Supreme Court held that the police power of the state, as exercised by a statute forbid-

ding mining in such a way as to cause subsidence, cannot be stretched so far as "to destroy previously existing rights of property and contract." *Id.* at 413. In balancing the respective rights of the surface owners whose land was subsiding, and the mine owners whose estate would be rendered valueless, the Court concluded that it could not supply the rights to support that the surface owners had neglected to obtain by deed.

> So far as private persons or communities have seen fit to take the risk of acquiring only surface rights, we cannot see that the fact that their risk has become a danger warrants the giving to them greater rights than they bought.

*Id.* at 416. We cannot construe the Act to give PMC more rights than it acquired by its deed referred to *supra,* nor can we place such a burden on DER.[13] The consideration of rights flowing from contracts of sale are best addressed by a court of common pleas, and not by DER, whose expertise does not extend to the analysis of chains of title and the limitations therein. The proper court could determine to what degree, if any, the surface owner/driller "must respond in damages" for problems caused by the well. *Chartiers,* 152 Pa. at 297.

We repeat, DER's statutory authority under the Act is limited to ascertainment of whether a well can be safely drilled, and, if so, where on the driller's tract of land it can be located where it will least interfere with or endanger the mine.

---

[13] *Cf. Mignatti Construction Co. v. Department of Environmental Resources,* 49 Pa. Commonwealth Ct. 497, 411 A.2d 860 (1980) for an analysis of what DER must do to meet the standards of compliance with Article 1, Section 27 of the Pennsylvania Constitution, regarding conservation and maintenance of the Commonwealth's resources.

Einsig finally argues that the adjudication of the Board is actually a regulation which is invalid because it was not promulgated pursuant to the provisions of the Commonwealth Documents Law, 45 Pa. C. S. §501, *et seq.* We find no merit in this assertion.

In *Pennsylvania Human Relations Commission v. Norristown Area School District,* 473 Pa. 334, 345, 374 A.2d 671, 677 (1977), the Pennsylvania Supreme Court observed that "[t]he Administrative Agency Law envisions that administrative agencies may proceed by rule-making or adjudication." We do not perceive that the passage of the new Administrative Agency Law, 2 Pa. C. S. §§551-704, has any effect on the accuracy of that statement. As the Court noted later in *Norristown Area,* quoting *Pacific Gas and Electric Co. v. FPC,* 164 U.S. App. D.C. 371, 506 F.2d 33 (1974), "[a]n agency may establish binding policy through rulemaking procedures by which it promulgates substantive rules, or through adjudications which constitute binding precedents." 473 Pa. at 349, 374 A.2d at 679. This is an adjudication, and constitutes precedent as binding as any other, in that, in a situation which presents the same facts, and applies the same law, it will control the result, until such time as a party argues successfully that it was inaccurate or incorrect. A regulation, on the other hand, once properly promulgated, cannot be collaterally attacked as being inaccurate, or incorrect, if it was adopted following the proper statutory procedures, is within the scope of its enabling legislation, and otherwise passes constitutional muster.

The Board simply could not wait for the passage of regulations in this instance. It was called upon to construe statutory language in a matter requiring prompt action. No regulations have been promul-

gated under the Act,[14] and no Pennsylvania case law exists which would aid the Board in its analysis. It was incumbent upon the Board to set *some* standard, to create *some* framework, within which it could make a decision. Having decided what it believed the statutory language meant, the Board logically set forth the method by which PMC could prove its case, and what Einsig could do to rebut it. That is the essence of its adjudicatory function. The only alternative would have been to decline to decide the case in the absence of promulgated regulations, and that action would have been not only inappropriate, but in derogation of that flexibility permitted those agencies which "may proceed by . . . adjudication.[15]

Because we conclude that the test formulated by the Board does not track the intent of the Legislature when it passed the Act, and is susceptible of frequently confiscatory application, we are compelled to reverse on those grounds in addition to the previously discussed failure of the conclusions of law to flow from the findings of fact.

Order reversed.

## ORDER

AND Now, this 15th day of October, 1982, the Adjudication and Order of the Environmental Hearing Board dated September 9, 1982, filed to Docket No. 82-176-G is reversed, and the permit issued by the Department of Environmental Resources to Barry D. Einsig for the purpose of drilling a gas well known as the Gardner Well is hereby reinstated.

---

[14] This Act does not mandate the publication or promulgation of regulations to effectuate its purposes.

[15] The possibility that the application of the standards, as an irrebuttable presumption, might give rise to a different result in a later case, is not here determined.