96 Pa. Commonwealth Ct. 361 (1986)
508 A.2d 348
Del-AWARE Unlimited, Inc. et al., Petitioners
v.
Commonwealth of Pennsylvania, Department of Environmental Resources, Respondent.
Friends of Branch Creek, Inc. et al., Petitioners
v.
Commonwealth of Pennsylvania, Department of Environmental Resources, Respondent.
Philadelphia Electric Company, Petitioner
v.
Commonwealth of Pennsylvania, Department of Environmental Resources, Respondent.
Nos. 2240 C.D. 1984, 2114 C.D. 1984 and 2072 C.D. 1984.
Commonwealth Court of Pennsylvania.
Argued June 5, 1985.
April 15, 1986.
*362 Argued June 5, 1985, before President Judge CRUMLISH, JR., and Judges ROGERS, CRAIG, MacPHAIL, DOYLE, BARRY and COLINS.
*363 Robert J. Sugarman, with him, Robin T. Locke, Sugarman, Denworth & Hellegers, for petitioners, Del-AWARE Unlimited, Inc. et al.
James M. Neill, Hartzel and Bush, for petitioners, Friends of Branch Creek, Inc. et al.
Troy B. Conner, Jr., with him, Robert M. Rader, Conner & Wetterhahn, P.C.; Of Counsel: Edward G. Bauer, Jr., and Eugene J. Bradley, and Bernard Chanin, with him, Pamela S. Goodwin, Wolf, Block, Schorr and Solis-Cohen, for petitioner/intervenor, Philadelphia Electric Company.
Louise S. Thompson, for respondent.
OPINION BY PRESIDENT JUDGE CRUMLISH, JR., April 15, 1986:
For our consideration and disposition herein are various challenges to the resolution by the Environmental Hearing Board (EHB) of disputes surrounding the permits required to construct facilities to supply water for cooling a nuclear generating station in Limerick, *364 Montgomery County, Pennsylvania, and meeting the citizens' requirements of Bucks and Montgomery Counties.
Again, we recognize that this construction has inspired widespread public discussion and disagreement. See Sullivan v. County of Bucks, 92 Pa. Commonwealth Ct. 213, 499 A.2d 678 (1985). Nonetheless, we are obliged and intend to confine our consideration to the merits of the legal issues presented.
As we wrote in Sullivan, the purpose of the Point Pleasant water diversion project (project) is to construct a system by which Delaware River water could be withdrawn by the Point Pleasant Pumping Station (pumping station) and pumped through a combined transmission main to the Bradshaw Reservoir and Pump House where (1) water for public use by Bucks and Montgomery Counties would travel through the north branch transmission main, discharge into the North Branch Neshaminy Creek and flow along the creek to the north branch water treatment plant where it would be pumped, in part, to the North Penn (NP) and North Wales (NW) Water Authorities and (2) supplemental cooling water for the Limerick nuclear generating station, owned by the Philadelphia Electric Company (PECO), would be pumped through the east branch transmission main, discharge into the East Branch Perkiomen Creek and flow along the creek to the Perkiomen Pump House where it would be withdrawn and pumped to Limerick. Supplemental cooling water is necessary because PECO is denied access to Schuylkill River water for several months each year.[1]
*365 The Department of Environmental Resources (DER) granted all permits necessary to commence construction. Del-AWARE Unlimited, Inc. (Del-AWARE), appealed this decision to EHB. Friends of Branch Creek, Inc. (Friends of Branch Creek), then intervened.[2] Although EHB upheld DER's decision in part, it remanded to DER requiring (1) National Pollutant Discharge Elimination System (NPDES) permits for diversion of water from the Delaware River into the North Branch Neshaminy and East Branch Perkiomen Creeks, (2) that the need for the project be balanced against the impact of erosion on the receiving streams if the velocities in the streams cannot be reduced to 2.0 feet per second (fps) and (3) that PECO's permit be conditioned on a cutoff when the water flows measured at the Bucks Road Gauge exceed 125 cubic feet per second (cfs).[3]
Our scope of review of an EHB decision is limited to a determination of whether an error of law has been committed, constitutional rights have been violated or any findings of fact are unsupported by substantial evidence. Einsig v. Pennsylvania Mines Corp., 69 Pa. Commonwealth Ct. 351, 452 A.2d 558 (1982).

No. 2240 C.D. 1984
Del-AWARE appeals that portion of the EHB order[4] upholding DER's grant of various permits[5] to PECO *366 and the Neshaminy Water Resources Authority (NWRA).
Del-AWARE first contends that EHB violated its constitutional due process right to a full, fair and impartial hearing[6] by curtailing its presentation of evidence *367 on aesthetic impact, alternative water supplies and adverse environmental effects merely to insure the hearing examiner's timely departure from the Board.[7] It argues that the hearing examiner improperly excluded the direct testimony of seven of its witnesses.[8] However, our review of the record reveals substantial evidence to support EHB's conclusion that this proffered testimony was either cumulative, speculative or irrelevant and, therefore, had no likelihood of causing it to alter the findings of fact in its adjudication.[9] We therefore hold *368 that EHB did not abuse its discretion by limiting Del-AWARE's presentation of such evidence. 25 Pa. Code §21.90.[10]See also Geders v. United States, 425 U.S. 80 (1976) (trial judge may refuse to allow cumulative, repetitive or irrelevant testimony). It also argues that EHB improperly cut short the testimony of one of its rebuttal witnesses, excluded that of another and denied its oral and written motions for reopening and rebuttal. However, we hold that, in rejecting Del-AWARE's proffered rebuttal, EHB did not abuse its discretion by excluding this rebuttal evidence because it could have been presented during the case in chief. See Downey v. Weston, 451 Pa. 259, 301 A.2d 635 (1973).[11]
*369 Secondly, Del-AWARE contends that DER failed to adequately consider the pumping station's impact on the natural, scenic, historic and aesthetic features[12] of the *370 Delaware Canal (canal)/Roosevelt State Park (park) and surrounding Point historic district (historic district).
Del-AWARE asserts that DER must explicitly find an "overriding public necessity" for allowing the intake pipeline to cross under the Commonwealth-owned canal.[13] It argues that this was not done because DER (1) at most made an implicit finding of necessity, (2) incorrectly assumed that the conclusion that the canal must be crossed was inherent in its initial decision to approve the project and (3) failed to inquire as to (a) alternative locations or (b) methods to minimize the pumping station's intrusiveness. We reject these arguments. The relevant statutes[14] merely require that DER determine *371 that a service line is (1) necessary for public service and (2) at least reasonably required to cross Commonwealth land, before it grants a right-of-way through Commonwealth lands. Moreover, we discern nothing to indicate that DER's determination must take the form of an explicit finding. It appears from the record that (1) DER did not err by declining to consider alternative locations for the pipeline because, given the location of the property on which the pumping station would be built, there were no logical/feasible alternatives and (2) the initial approval of the project by DER necessarily involved a right-of-way across the canal. More conclusively, however, our review of the record reveals substantial evidence in support of EHB's conclusion that DER's finding, that the intake pipeline was necessary and was reasonably required to cross Commonwealth land, was implicit in its decision to grant the right-of-way. Finally, we hold that EHB reasonably concluded that construction of the intake will not adversely affect the canal and that the right-of-way will involve minor patch-up work which would cause no permanent deleterious effect to Commonwealth land.[15]
Del-AWARE also asserts that DER gave no consideration to the actual aesthetic impacts of the pumping station on the park and the historic features of Point Pleasant Village, which is visible from and integral to the park. It argues that DER thus failed to render a *372 decision, balancing environmental and social concerns pursuant to PA. CONST. art, I, §27, which would pass the three-prong test set forth in Payne v. Kassab, 11 Pa. Commonwealth Ct. 14, 312 A.2d 86 (1973), aff'd, 468 Pa. 226, 361 A.2d 263 (1976).[16] Specifically, it complains that DER's only expert, by restricting his consideration to the aesthetic impact of structures and occurrences within the park's boundaries, precluded any evaluation of the dominating visual effect of the nearby pumping station on the park and historic district. Also, it claims that EHB improperly found that DER examined a full set of drawings, showing evaluations and landscaping plans for the pumping station, alleging that these drawings fail to depict a parking lot, transformer pad and twenty-foot embankment. Although DER admits that the pumping station's aesthetic effect on the park and historic district was not considered by its expert, it contends that EHB correctly found that DER lawfully relied on reviews of the pumping station by the Pennsylvania Historical and Museum Commission, Corps of Engineers and the Nuclear Regulatory Commission (NRC), all of which found that the pumping station would be compatible with the park *373 and historic district.[17] We agree. Although this Court, in Community College of Delaware County v. Fox, 20 Pa. Commonwealth Ct. 335, 342 A.2d 468 (1975), held that DER may not second-guess the propriety of decisions properly made by other agencies while conducting its own constitutionally mandated evaluation of environmental concerns, it did not prohibit DER from considering the relevant findings of other agencies while engaged in such a review.[18] Moreover, we cannot say that the drawings were not reasonably accurate, even if the alleged deficiencies did exist.
Del-AWARE's third contention is that EHB erred by finding that DER adequately considered the withdrawal of supplemental cooling water for the Limerick nuclear generating station from Blue Marsh Reservoir (Blue Marsh) as an alternative to diverting Delaware River water. It bases this contention on DER's admitted failure to consider Blue Marsh among the alternatives evaluated in its Environmental Assessment of the project. DER only reviewed Blue Marsh when pressed by Del-AWARE during the EHB hearings. We reject this contention. When reviewing permit applications, DER's pertinent regulation, 25 Pa. Code §105.14(b)(7),[19] *374 requires it to consider only alternatives which are "available to minimize the adverse impact of the project upon the environment." (Emphasis added.) We are convinced by our review of the record that DER's omission of Blue Marsh from its Environmental Assessment was based on its reasonable conclusion that Blue Marsh was not an "available" or environmentally superior alternative. Moreover, there is substantial evidence to support EHB's conclusion that Blue Marsh is not a viable alternative due to its technical infeasibility as an alternative supplemental cooling water source for even one unit at Limerick,[20] the legal impediments to the use of Blue Marsh[21] and the unfairness of giving all the unallocated water from the sole substantial reservoir on the Schuylkill River to one consumptive user.
Del-AWARE next contends that although EHB correctly ruled that NPDES permits were required for discharges into the North Branch Neshaminy and East Branch Perkiomen Creeks, it improperly ignored DER's coordinated permit review policy by remanding *375 solely for acquisition of NPDES permits instead of vacating all the permits granted by DER and ordering an entirely new coordinated review.[22] We disagree. As EHB noted, nothing in the regulations governing the NPDES program requires coordinated review.[23] Moreover, DER naturally did not coordinate a pursuit of NPDES permits with its review of all other permits because it concluded that NPDES permits were not required. Our review of the record reveals nothing to indicate that vacating all the permits in question for a coordinated review with NPDES permits would significantly enhance DER's review. Although we do not advocate "piecemeal" review, there is no requirement of totally coordinated review and we do not believe that the drastic, impractical, and time consuming action requested by Del-AWARE is an appropriate way to enforce DER's laudable policy.
Del-AWARE's final contention is that EHB improperly relied on the findings and conclusions in a non-final NRC[24] Atomic Safety Licensing Board decision, concerning *376 the impacts of the project's intake on fisheries resources at Point Pleasant, in reviewing DER's related environmental findings. We disagree. The record reveals no blind adoption of NRC's conclusions as to the impacts on the Delaware's aquatic life.[25] Indeed, Del-AWARE admits that at least some of EHB's findings were buttressed with factual details from other sources. As was the case regarding DER's use of findings by other agencies, we discern nothing prohibiting EHB from considering NRC's findings when evaluating the adequacy of DER's determination.

No. 2114 C.D. 1984
Friends of Branch Creek appeals that portion of the EHB order permitting high water velocities in the East Branch Perkiomen Creek (East Branch), caused by the discharge of Delaware River water from the east branch transmission main. The order authorized velocities of 2.0 fps or less in the East Branch and allowed even greater velocities if the benefits to be derived from the project clearly outweigh the quantified erosion damage, after mitigation, to the East Branch.
Friends of Branch Creek first contends that EHB's finding that no erosion will be caused by increased water velocities of 2.0 fps or less is not supported by substantial evidence. Specifically, it argues that EHB inappropriately considered evidence pertaining to aged canals[26] in arriving at an acceptable water velocity for *377 the irregularly shaped and turbulent East Branch. We disagree. Our review of the record reveals substantial evidence supporting the Board's finding that the East Branch (1) in fact resembles an aged canal rather than a new one and (2) is principally shaped by floods with velocities as high as 7 to 10 fps.
Secondly, Friends of Branch Creek contends that the Payne cost-benefit analysis EHB imposed upon DER, for allowance of water velocities over 2.0 fps, fails to sufficiently protect the riparian rights of downstream landowners. It specifically argues that EHB provided this protection because it erroneously accepted DER's permit evaluation which was based on its regulations for stream crossings, outfalls and headwalls (which require that DER consider the erosive impacts of an outfall),[27] rather than those concerning proposed channel changes and dredging.[28] Friends of Branch Creek asserts that the higher water velocities could change the East Branch's channel. We agree that the latter regulations have more protective informational[29] and mitigative[30] *378 requirements. However, we must uphold EHB's conclusion that DER properly considered only possible erosive impacts because the permit was for an outfall, not *379 for a proposed channel change or dredging, regardless of any unintended consequences.[31]
In a related argument, Friends of Branch Creek asserts that EHB erred in concluding that private land could be entered by PECO pursuant to a permit condition or by DER to mitigate damage to the East Branch.[32] We disagree. Initially, EHB acknowledged that property owners could refuse to allow PECO on their land. More importantly, however, we hold that DER must enter and correct erosion damage caused by the diversion if PECO cannot, whether pursuant to the provisions of the Act of May 12, 1925[33] or the requirements of DER's outfall regulations, given DER's duty to reduce environmental incursions to a minimum under the second prong of the Payne test.
Friends of Branch Creek next contends that, although EHB conceded the existence of wetlands along the East Branch downstream from the discharge area, it erroneously concluded that the discharge would have no effect on the wetlands. We disagree. EHB's conclusion was based on its determination that neither Friends of Branch Creek nor Del-AWARE made the required demonstration that the discharge would overtop the East Branch's banks or otherwise inundate the wetlands. Our review of the record reveals substantial evidence supporting the underlying proposition that *380 occasional increases in the water level which do not go beyond those naturally accommodated by the East Branch Perkiomen Creek's banks will not abnormally affect the wetlands.[34]
Friends of Branch Creek's final contention is that EHB erred by accepting DER's failure to consider the alternative of discharging diverted water at a point downstream, where the East Branch's channel is larger, instead of into its narrower headwaters.[35] We disagree. Our review of the record supports the Board's conclusion that the reason DER did not consider this alternative was that it was not presented to DER prior to its hearings. Friends of Branch Creek cites no authority requiring EHB to remand to DER for consideration of this alternative based merely on the fact that it was mentioned briefly during EHB's hearing on Friends of Branch Creek's motion to intervene. To the contrary, Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519 (1978), held that intervenors must structure their participation so that it alerts the agency of their contentions (obscure references to matters that "ought to be" considered are not sufficient).[36]

*381 No. 2072 C.D. 1984

PECO appeals that portion of the EHB order which remanded to DER requiring acquisition of a NPDES permit for diversion of water from the Delaware River into the East Branch.[37]
PECO contends that NPDES requirements do not pertain to this discharge because it will not be from a "point source,"[38] as defined in Section 502(14) of the Act of June 30, 1948, 33 U.S.C. §1362(14). We disagree. PECO relies on National Wildlife Federation v. Gorsuch, 693 F.2d 156 (D.C. Cir. 1982), which held that water released from a particular dam to a stream below was not from a "point source." However, National Wildlife Federation is distinguishable because it dealt with water diversion within a single body of water, *382 whereas here water will be diverted from one body of water (the Delaware River) to another (the East Branch). Unlike National Wildlife Federation, "addition from a point source occurs [because] the point source itself physically introduces a pollutant into the water from the outside world." National Wildlife Federation, 693 F.2d at 175. Most importantly, the definition of "point source" includes pipes, which are involved here.[39]

*383 Conclusion

With respect to each appeal, we hold that there is substantial evidence in the record to support EHB's findings and that it committed no error of law in its adjudications.
Affirmed.

ORDER IN 2240 C.D. 1984
The orders of the Environmental Hearing Board, Nos. 82-177-H and 82-219-H dated June 18, 1984 and Nos. 82-219-G and 82-177-G dated August 30, 1984 (as amended by Nos. 82-219-G and 82-177-G dated September 7, 1984), are affirmed.

ORDER IN 2114 C.D. 1984 AND 2072 C.D. 1984
The order of the Environmental Hearing Board, Nos. 82-177-H and 82-219-H dated June 18, 1984, is affirmed.
Judge COLINS dissents.
Judge PALLADINO did not participate in the decision in this case.
NOTES
[1] The Delaware River Basin Commission has prohibited PECO from withdrawing water from the Schuylkill River when flows and/or temperatures fall below specified levels.
[2] Del-AWARE is a citizens' group seeking to protect the Delaware River, while Friends of Branch Creek is a similar group concerned with the East Branch Perkiomen Creek.
[3] The Bucks Road Gauge is a standard stream gauging station on the East Branch Perkiomen Creek at Bucks Road which will be installed and maintained so that PECO and the Delaware River Basin Commission can monitor the creek's flow.
[4] Del-AWARE's appeal also embraces the EHB order of August 30, 1984, as amended by its order of September 7, 1984, denying its motion for reconsideration and/or reopening.
[5] DER granted PECO permits to construct and maintain (1) a water supply pipeline under the beds and across the channels of various Bucks County streams, (2) an outfall structure, energy dissipater and channel stabilization at the East Branch Perkiomen Creek discharge point and (3) the Bradshaw Reservoir and Pump House. DER also granted NWRA a permit to construct and maintain (1) an intake structure in the Delaware River, (2) an intake conduit crossing the Delaware Canal, (3) a water main crossing a stream and (4) an energy dissipater and outlet channel in the North Branch Neshaminy Creek and granted NWRA a right-of-way to construct a pipeline under the Delaware Canal.
[6] Del-AWARE claims due process rights under (1) PA. CONST. art. I, §§1, 11 and 27, which provides:

§1. Inherent rights of mankind
All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.
§11. Courts to be open; suits against the Commonwealth
All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay. Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct.
§27. Natural resources and the public estate
The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.
and (2) U.S. CONST. amend. XIV which provides, in pertinent part, "nor shall any State deprive any person of life, liberty, or property, without due process of law."
[7] On the fourth hearing day, April 11, 1983, the hearing examiner (Dennis J. Harnish  EHB member) announced his intention to leave EHB for a position with the Pennsylvania Public Utility Commission (PUC) as of May 16, 1983.
[8] Upon the commencement of the afternoon session on April 29, 1983, the hearing examiner instructed Del-AWARE that it must complete the presentation of its case by the end of the day.
[9] EHB so concluded in its August 30, 1984 order denying Del-AWARE's motion for reconsideration and/or reopening.

Del-AWARE allegedly proffered direct testimony in the nature of (1) two witnesses on the availability of alternative water sources to meet the citizens' requirements of Bucks and Montgomery Counties (one testifying that groundwater could be sufficient and the other testifying that he had informed DER of the availability of water for sale by Philadelphia but that DER failed to consider or pursue this option), (2) two witnesses on the adverse archeological, aesthetic and historic impacts of the pumping station on the Point Pleasant historic district and Delaware Canal/Roosevelt State Park (one of which would have contradicted EHB's finding that DER examined a full set of drawings showing elevations and landscaping plans for the pumping station), (3) one witness on water quality impacts from the discharges into the Neshaminy and Perkiomen Creeks and (4) two witnesses on the adverse impacts of diversion on Delaware River dissolved oxygen and salinity levels. However, a review of the record reveals (1) (a) that the Commonwealth already has a system for joint development and use of ground and surface water and that groundwater for Bucks and Montgomery Counties is already highly stressed and (b) nothing to demonstrate that water for sale by Philadelphia could realistically by made available, (2) that DER thoroughly considered the pumping station's impacts by looking to reports of other agencies as well as the drawings (allegedly incomplete only in failing to depict a parking lot, transformer pad and twenty-foot embankment) and (3) no evidence, or specific argument, that the effects of diversion and discharge were not adequately considered.
Del-AWARE also contends that EHB improperly rejected repeated alternative proffers of its evidence by way of deposition testimony and testimony from other agency proceedings. However, the form in which the evidence was presented does not affect EHB's ultimate decision to exclude it due to its nature.
[10] This section provides:

§21.90. Limiting number of witnesses and additional evidence.
(a) The Board may limit the number of witnesses upon any issue and may require any party to present additional evidence on any issue.
(b) The provisions of subsection (a) supplement the provisions of 1 Pa. Code §35.127 (relating to limiting number of witnesses) and §35.128 (relating to additional evidence).
[11] In that case our Supreme Court held that "[t]he trial court has discretion in excluding as rebuttal evidence that which is properly part of the case in chief." Downey, 451 Pa. at 269, 301 A.2d at 641. Del-AWARE sought to present rebuttal testimony as to the availability of Blue Marsh Reservoir as an alternative water supply for PECO and as to the adverse erosion and flooding impacts on the East Branch Perkiomen Creek. However, our review of the record reveals that the alleged availability of Blue Marsh Reservoir for PECO could have been raised on direct and that Del-AWARE, in fact, produced significant testimony regarding adverse impacts to the East Branch Perkiomen Creek during its case in chief.

Del-AWARE also challenges EHB's October 6, 1983 order requiring that all post-hearing briefs be filed by October 21, 1983 (which it asserts was only ten days away on the date it received the order). It alleges that it was denied an extension of this unreasonably restricted briefing schedule during a conference call on October 20, 1983 and, therefore, filed no post-hearing brief. In Township of Newton v. Workmen's Compensation Appeal Board (Newby), 74 Pa. Commonwealth Ct. 475, 459 A.2d 1372 (1983), this Court held that the referee denied the employer the right to a full hearing, in violation of Section 506 of the Administrative Agency Law, 2 Pa. C. S. §506, by handing down his order before the employer filed its proposed findings of fact, conclusions and memorandum of law. However, Township of Newton is distinguishable from the case sub judice because there neither the referee nor opposing counsel responded to the employer's request for an extension. Indeed, that case implicitly upheld the authority of a hearing examiner to limit the time for such submissions, citing with approval the workmen's compensation rule providing:
§131.61. Briefs.
(a) The referee may require or the parties may submit proposed findings of fact, conclusions of law, and legal briefs or memoranda to the referee for his review and consideration.
(b) All submissions referred to in subsection (a) must be made within the time set by the referee, but except in extraordinary cases, not later than 45 days, following the completion of the evidentiary portion of the case.
(c) Subsections (a) and (b) supplement 1 Pa. Code §§35.191  35.193 (relating to briefs).
34 Pa. Code §131.61 (emphasis added). We find no deprivation of Del-AWARE's right to a full hearing because (1) Del-AWARE had from the close of the record, May 17, 1983, until October 21, 1983, to review the transcripts and prepare their submission, (2) all other parties submitted post-hearing briefs and (3) despite its complaints of inadequate time to prepare findings of fact, conclusions and legal argument, no such pleadings were ever filed by Del-AWARE.
[12] PA. CONST. art. I, §27 requires the Commonwealth to preserve "the natural, scenic, historic and esthetic values" of "Pennsylvania's public natural resources."
[13] Del-AWARE alleges that the testimony of a DER legal director establishes that DER is statutorily required to make a determination of "overriding public necessity" before issuing a right-of-way over Commonwealth lands.
[14] Section 1926-A of the Administrative Code of 1929 (Code), 71 Pa. C. S. §510-26, provides:

The Department of Environmental Resources shall have the power to lease rights-of-way for a period not exceeding thirty-five years, on such terms and conditions as it may consider reasonable, to owners of real property abutting State lands under the jurisdiction of the department.
Section 514 of the Code, 71 Pa. C. S. §194, provides in pertinent part:
(a) Except as otherwise in this act expressly provided, a department, board, or commission, shall not sell or exchange any real estate belonging to the Commonwealth, or grant any easement, right of way, or other interest over or in such real estate, without specific authority from the General Assembly so to do, but a department, board, or commission may, with the approval of the Governor, grant a license to any public service corporation to place upon, in, or over, any dry or submerged land or bridge of or maintained by the Commonwealth, any public service line, if such line will enable any State building or State institution to receive better service, or if such line is necessary for the service of the public and it is necessary or reasonably required to cross the Commonwealth's land to afford such service....
....
... In the case of submerged lands such licenses shall be granted only by the Department of Environmental Resources, and the permit shall prescribe such terms and conditions as shall be deemed necessary by the board to protect the interests of the public.
(Emphasis added.)
[15] Our review of the record reveals DER testimony, accepted by EHB, that there have been dozens, if not hundreds, of breaches in the canal and that neither the historical nor physical integrity of the canal has been undermined by the 127-plus utility crossings.
[16] This Court stated:

Judicial review of the endless decisions that will result from such a balancing of environmental and social concerns must be realistic and not merely legalistic. The court's role must be to test the decision under review by a threefold standard: (1) Was there compliance with all applicable statutes and regulations relevant to the protection of the Commonwealth's public natural resources? (2) Does the record demonstrate a reasonable effort to reduce the environmental incursion to a minimum? (3) Does the environmental harm which will result from the challenged decision or action so clearly outweigh the benefits to be derived therefrom that to proceed further would be an abuse of discretion?
Payne, 11 Pa. Commonwealth Ct. at 29-30, 312 A.2d at 94.
[17] Del-AWARE somewhat nebulously argues that the reviews by these agencies were not complete when DER issued its Environmental Assessment of the project. However, there is no basis in the record for the proposition that these reviews were incomplete for the purpose of evaluating aesthetic impacts.
[18] Reliance upon other agencies' findings comports with federal environmental practice. See, e.g., Henry v. Federal Power Commission, 513 F.2d 395 (D.C. Cir. 1975); Silentman v. Federal Power Commission, 566 F.2d 237 (D.C. Cir. 1977).
[19] This section provides:

(b) In reviewing any permit application under this chapter for construction or substantial modification of a dam or reservoir, water obstruction, or encroachment the Department will consider the following factors:
....
(7) The need for the proposed project to be located in or in close proximity to the water and alternatives in location, design, and construction which are available to minimize the adverse impact of the project upon the environment and to protect the public natural resources of the Commonwealth.
[20] It appears technically infeasible for even one unit, given the allocations for (a) Western Berks Township, (b) minimum conservation release to downstream aquatic life in the Tulpehocken Creek, (c) water quality augmentation and (d) recreation storage.
[21] Specific legal impediments include the unlikelihood of obtaining the necessary Delaware River Basin Commission (DRBC) authorization for releases and possible implications for Blue Marsh, which is used to maintain the flow in the Schuylkill, of the DRBC restrictions upon withdraw of Schuylkill River water when it flows beneath a certain level.
[22] Del-AWARE contends that DER's failure to coordinate its review with a pursuit of NPDES permits violated the first prong of the Payne test. However, this first prong requires only "compliance with all applicable statutes and regulations." (Emphasis added.) Here, we are at most dealing with an unwritten DER policy.
[23] 25 Pa. Code §92.21 only generally requires that "[p]ersons wishing to commence discharges of pollutants shall file a complete NPDES application not less than 180 days before the date on which it is desired to commence the discharge. ..." Despite Del-AWARE's arguments, EHB held only that neither this provision, nor Payne (of which the Environment Quality Board was presumably aware when it promulgated 25 Pa. Code §92.21), nor the circumstances of this controversy force it to overturn the appealed-from permits.
[24] We reject Del-AWARE's assertion that NRC has no environmental expertise because it is responsible for reviewing the environmental impacts of major federal actions and has adopted detailed procedures for compilation and review of environmental data under 10 C.F.R. Part 51.

We also reject Del-AWARE's argument that EHB did not consider the record testimony underlying the NRC Atomic Safety and Licensing Board's decision, as mere speculation.
[25] Despite Del-AWARE's contrary contention, it appears that both EHB and NRC focused on the impacts on the shad population at Point Pleasant (even assuming it was a spawning ground).
[26] Specifically, the erosion standards of the American Society of Civil Engineers.
[27] 25 Pa. Code §§105.291  314.
[28] 25 Pa. Code §§105.221  245. Friends of Branch Creek argues that these regulations should be used because of alleged unavoidable and known changes that will occur in the channel of the East Branch Perkiomen Creek.
[29] 25 Pa. Code §105.231 provides:

(a) Construction or modification of channel changes. Construction or modification of channel changes shall include the following:
(1) In addition to the information required by §105.13 of this title (relating to permit applications  information and fees), all permit applications pursuant to this subchapter for the construction or modification of channel changes shall contain the following information:
(i) The location and length of the proposed channel change.
(ii) A stream profile for a reasonable distance upstream and downstream of the proposed change, showing bed slopes, normal water surface and depths, flood water surfaces, existing obstructions, and the location of public and industrial water supply intake.
(iii) Such cross-channel sections as are necessary to indicate the scope of the proposed work.
(iv) Estimates of flood frequencies and flood flows at the site of the proposed channel change, including such information as is reasonably available regarding actual rainfall and flood flow records on the stream.
(v) A description of the purposes of the proposed channel change.
(vi) A plan for the disposal of excavated material.
(vii) Proof of title or adequate flowage and other easements for all lands included in the site of the proposed channel change.
(2) The Department may require additional information or waive any of the requirements of paragraph (1) of this subsection in specific cases.
(b) Dredging. Dredging shall include the following:
(1) In addition to the information required by §105.13 of this title (relating to permit application  information and fees), all permit applications for dredging for facility construction and maintenance pursuant to this subchapter shall contain the following information:
(i) The location and area of the proposed dredging.
(ii) A stream profile for a reasonable distance upstream and downstream of the proposed dredging showing normal water surface and depths.
(iii) A description of the equipment to be employed in the dredging operation and a plan for the disposal of the dredge soil.
(iv) Proof of title or easements for all lands included in the site of the proposed dredging.
(2) The Department may require additional information or waive any of the requirements of paragraph (1) of this subsection in specific cases.
[30] 25 Pa. Code §105.242(d) and (e) provide:

(d) Where the width of a channel change is greater than the width of the preexisting channel, provision shall be made to assure proper depth and velocity of normal flows, subchannels, and installation of stream habitat improvement devices.
(e) In streams having substantial fisheries value, provision shall be made in all channel changes to maintain existing pool-riffle ratios.
[31] Moreover, we agree with the EHB that the possibility of erosive velocities downstream of an outfall must always be considered under the general requirements of 25 Pa. Code §§105.1  63, requiring DER to review effects on stream regime and the riparian rights of property owners, implement mitigative and protective measures and ultimately engage in a Payne type cost-benefit analysis if it finds that significant environmental harm will occur despite attempts at mitigation. See, e.g., 25 Pa. Code §§105.14-16.
[32] The ability to mitigate is important because erosion damage after mitigation is weighed in the Payne cost-benefit analysis.
[33] P.L. 626, as amended, 32 P.S. §§651  678.2.
[34] Because we agree with EHB that no wetlands were demonstrably affected, we need not address Friends of Branch Creek's argument that the protections of 25 Pa. Code §105.17(b) and (e) were required because "important wetlands" were affected.
[35] Because Friends of Branch Creek's arguments concerning alternatives such as Blue Marsh are virtually identical to those of Del-AWARE, we need not further consider them.
[36] Specifically, the United States Supreme Court stated:

In the first place, while it is true that NEPA places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action, it is still incumbent upon intervenors who wish to participate to structure their participation so that it is meaningful, so that it alerts the agency to the intervenors' position and contentions. ... Indeed, administrative proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that `ought to be' considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated on the ground that the agency failed to consider matters `forcefully presented.'
Vermont Yankee Nuclear Power Corp., 435 U.S. at 553-54.
[37] EHB's decision considered the water pollution control standards of Sections 101  517 of the Act of June 30, 1948 (Act), 33 U.S.C. §§1251  1376.
[38] Section 301 of the Act, 33 U.S.C. §1311, prohibits "discharge of any pollutant" (from a "point source") absent compliance with the NPDES (permit) requirements of Section 402 of the Act, 33 U.S.C. §1342. Section 502(12) of the Act, 33 U.S.C. §1362(12), defines the term "discharge of a pollutant" to mean "any addition of any pollutant to navigable waters from any point source," while Section 502(6) of the Act, 33 U.S.C. §1362(6), defines the term "pollutant" to mean "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water."
[39] Section 502(14) of the Act, 33 U.S.C. §1362(14), specifically defines the term "point source" to mean "any discernible, confined and discrete conveyance, included but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." (Emphasis added.)

However, PECO argues that a water diversion is expressly included among "nonpoint sources" by Section 304(f)(2)(F) of the Act, 33 U.S.C. §1314(f)(2)(F), which provides:
The Administrator, after consultation with appropriate Federal and State agencies and other interested persons, shall issue to appropriate Federal agencies, the States, water pollution control agencies, and agencies designated under section 1288 of this title, within one year after October 18, 1972 (and from time to time thereafter) information including (1) guidelines for identifying and evaluating the nature and extent of nonpoint sources of pollutants, and (2) processes, procedures, and methods to control pollution resulting from 
....
(F) changes in the movement, flow, or circulation of any navigable waters or ground waters, including changes caused by the construction of dams, levees, channels, causeways, or flow diversion facilities.
(Emphasis added.) We disagree. PECO's diversion is not a "flow diversion" changing the "movement, flow, or circulation" of the East Branch Perkiomen Creek, as would a dam, levee, channel or causeway, but one introducing water from a separate basin into the East Branch Perkiomen Creek through a "discernible, confined and discrete conveyance": a "pipe."