**FOUNDATION COAL RESOURCES CORPORATION, Pennsylvania Land Holdings Corporation, and Realty Company of Pennsylvania, Petitioners**

v.

**DEPARTMENT OF ENVIRONMENTAL PROTECTION and Penneco Oil Company, Inc., Respondents.**

Commonwealth Court of Pennsylvania.

Argued Oct. 14, 2009.
Decided April 27, 2010.

Brian J. Clark and Eugene E. Dice, Harrisburg, for petitioners.

Michael J. Heilman, Asst. Regional Counsel, Pittsburgh, for respondent, Department of Environmental Protection.

John R. McGinley, Jr., Pittsburgh, for respondent, Penneco Oil Company, Inc.

BEFORE: LEADBETTER, President Judge, PELLEGRINI, Judge, SIMPSON, Judge, LEAVITT, Judge, and BUTLER, Judge.

OPINION BY President Judge LEADBETTER.

Foundation Coal Resources Corporation, Pennsylvania Land Holdings Corporation, and Realty Company of Pennsylvania (collectively, Foundation Coal) petition this court for review of the order of the Environmental Hearing Board (EHB), upholding the issuance of seven oil and gas well permits by the Department of Environmental Protection (DEP) to Penneco Oil Company, Inc. (Penneco). The issues are whether Foundation Coal had standing to file objections under Section 202 of the Oil and Gas Act [1] as a "projected and platted but not yet being operated" coal mine, to the permits issued by DEP to Penneco; and whether DEP improperly issued the permits without the conditions Foundation Coal proposed in order to avoid undue interference with or endangerment to its coal mine. After review, we affirm.

Foundation Coal is the owner of massive coal reserves in Greene County, known as the Greene Manor and CNG coal reserves covering approximately 45,000 acres. Foundation Coal intends to mine what is known as the Pittsburgh Seam located roughly 1000 to 1200 feet below the earth's surface; and possibly thereafter, the Sewickley Seam located 80 to 90 feet above the Pittsburgh Seam. Foundation Coal plans to call this future mine the Foundation Mine, and it predicts that it will take approximately three years for the permit review process and then another two years for the issuance of the permit before it can commence operations at the mine. Foundation Coal estimates that its coal mining operations at the Foundation Mine will continue for about 40 years once actual coal extraction has begun.

Penneco has approximately 20,000 acres of oil and gas leases in Greene County, a substantial portion of which intersects with Foundation Coal's coal reserves. The oil and gas producing formations that Penneco seeks to target are generally located 3000 to 4000 feet below the surface and below the coal producing formations identified as the Pittsburgh and Sewickley

1. Act of December 19, 1984, P.L. 1140, *as amended*, 58 P.S. § 601.202.

Seams. Therefore, Penneco would have to drill through Foundation's proposed mine to reach the oil and gas reserves. Between 2005 and 2007, Penneco filed permit applications to drill seven new wells, four of which are oil wells (identified as Braddock 1, 2, 3 and 4), and three of which are natural gas wells (identified as Gaines, Porter and Orndoff).

In accordance with Section 201(b) of the Oil and Gas Act, 58 P.S. § 601.201(b), Penneco identified Foundation Coal as the "owner of record or operator of all known underlying workable coal seams ... in the tract to be drilled." Section 201(b) requires that Penneco provide Foundation Coal with copies of maps showing the proposed well locations. Foundation Coal objected to the permits, even though it did not yet have an operating coal mine on the Pittsburgh and Sewickley Seams, claiming it had "an already projected and platted but not yet being operated" coal mine as identified in Section 202(b) of the Act, 58 P.S. § 601.202(b). This section provides:

> In case any well location referred to in section 201(b) is made so that the well when drilled will penetrate anywhere within the outside coal boundaries of any operating coal mine *or coal mine already projected and platted but not yet being operated* or within 1,000 linear feet beyond such boundaries and the well when drilled or the pillar of coal about the well will, in the opinion of the coal owner or operator, unduly interfere with or endanger such mine, then the coal owner or operator affected shall have the right to file objections in accordance with section 501 to such proposed location. [Emphasis added.]

First, Foundation Coal alleged that the proposed oil and gas wells could jeopardize the safety of its miners; and second, that the proposed wells could impose economic burdens on it. Foundation Coal ultimately asked DEP to include the following special conditions with each permit, which are set forth here:

1. After the well authorized hereby is drilled, the permittee shall promptly conduct a directional deviation survey from the point of penetration at the surface to the target depth so as to locate the well bore precisely at each workable coal seam. Upon completion of the survey, it shall notify in writing each coal owner, operator and lessee that such has been completed. Thereafter it shall promptly provide a copy to the Department and to any coal operator, owner or lessee requesting one.

2. The permittee will obtain a well log (i.e., a standard gamma, density and neutron well log) from the surface to the target depth so as to accurately be able to identify the depth and thickness of potentially workable coal seams. Upon completion of the well log, it shall notify in writing each coal owner, operator and lessee that such has been completed. Thereafter it shall promptly provide a copy of the well log from the surface to a depth of 1,500 feet to the Department and to any coal operator, owner or lessee requesting one.

3. For purposes of this permit condition 3, the plugging requirement solely addresses the manner of plugging and not the timing of when the well is to be plugged and abandoned. Such timing shall be determined by the permittee, an agreement of the respective parties, court order or by Department action. When the well is plugged and abandoned, and in order to ensure safety and maximum recovery of resources, it will be done in a manner so as to allow the unimpeded and safe mining at a future date of all workable coal seams. For purposes of this permit a "workable" coal seam shall be any coal seam located

at a depth above 1,500 feet from the surface, and which is either (1) greater than 36 inches in thickness at the well bore, or (2) determined by the Department after consultation with the coal operator, owner or lessee to be considered part of a proven (measured) or probable (indicated) recoverable coal reserve. With respect to all such workable coal seams, the plugging and abandonment procedures will result in the removal of all metal from within the well bore for a distance of at least two times the seam thickness. The metal removal area shall extend equal distances above and below the coal seam. Metal may be removed by pulling the casing, milling the casing, or such other procedures as may be available at that time to remove all metal. After all such metal is removed, the well bore will be filled with a solid plug of expanding cement from the total depth to the surface. Notwithstanding the foregoing, the well shall at all times be plugged and abandoned in a manner which will allow unimpeded mining through the well bore in accordance with applicable Commonwealth or federal laws and regulations in force at the time of the plugging and abandonment.

4. After removal of the metal from the workable coal seams, and prior to plugging with cement, the permittee shall obtain a log, video or use another appropriate technique to confirm removal of the metal. Upon completion of the log or other method to confirm removal of the metal from the workable coal seams, it shall notify in writing each coal owner,

operator and lessee that such has been completed, and thereafter promptly provide a copy to the Department and to any coal operator, owner or lessee requesting one. The Certificate of Well Plugging (or any other similar form subsequently instituted by the Department) prepared and delivered to the Department shall explain therein (1) the procedure used to remove the metal from the workable coal seams, and (2) the method used thereafter to confirm such removal.

5. The requirements of the foregoing special conditions are in addition to all other requirements imposed by this Permit and/or applicable current and future statutes and regulations.

May 21–24 and June 6, 2007 Hearings, Exhibit A–34; Reproduced Record (R.R.) at 1364a–1365a. Although at the time it lodged its objections, Foundation Coal had not yet submitted a coal mining activity permit application (known as a "CMAP") to DEP for the Foundation Mine, DEP nevertheless held four conferences pursuant to Section 501(a) of the Act, 58 P.S. § 601.501(a), "for the purpose of discussing and endeavoring to resolve by mutual agreement" Foundation Coal's objections.[2]

At the conclusion of the conferences, DEP granted all of Penneco's permit applications. The permits included two conditions derived from Foundation Coal's proposed special conditions: first, Penneco was required to notify Foundation Coal when it was going to conduct well logging and allow Foundation Coal to conduct a deviation survey and well logging at the same time; and second, Penneco was re-

2. Although DEP did not make a finding as to whether Foundation Coal demonstrated that it had a projected and platted but not yet operating mine, which is a prerequisite for filing objections under Section 202(b) of the Act, EHB, which hears the case *de novo*, did consider the issue and concluded that even though Foundation Coal did not have a pro-

jected and platted but not yet operating mine under Section 202(b), it did have standing to object under Section 501, 58 P.S. § 601.501(a), which allows that "any person having a direct interest in the subject matter of this act may, at any time, request that a conference be held...."

quired to notify Foundation Coal when it intended to plug a well and allow Foundation Coal to inspect the well to ensure compliance with all applicable regulations for the safe mining of the well bore. Foundation Coal appealed the grant of Penneco's permits to the EHB.

At the hearing, the parties presented documentary and testimonial evidence over a five-day period. The EHB issued a 70–page adjudication, which included 176 findings, 26 pages of discussion and 21 conclusions of law. After discussing the factual and procedural history of these consolidated appeals, the EHB made the following relevant findings:

17. Section 202 of the Oil and Gas Act provides that coal owners and operators may submit written objections to a well permit application if the well is proposed to be located in one of three places: 1) within the boundaries of an operating coal mine; 2) within the boundaries of a projected and platted but not yet operating coal mine; and 3) within one thousand linear feet of the boundaries of 1 or 2. (N.T. 12)

18. If the coal operators meet one of the above criteria they are entitled to have a Section 501 conference to discuss their objections and try to resolve them. (N.T. 12)

. . . .

20. Foundation Coal objected to the oil and gas permits on two grounds: 1) the proposed wells could jeopardize the safety of miners, and 2) the proposed wells could impose economic burdens on them. They also said the wells['] location could be in future longwall mine panels and if they were, that would necessitate mining around the wells. (N.T. 12, 31; Exhibits C–12(a)–(e), C–15, A–34)

21. Appellants asserted in their objections that if drilled without Appellants' proposed special conditions, the wells would "(1) cause a large block of coal to be rendered forever unmineable, thus the Commonwealth's natural resources will not be protected and maximum recovery achieved; (2) impose higher costs on the coal owners; (3) potentially endanger the safety of personnel and facilities employed in the mining of coal, and (4) adversely impact the property rights of the coal owners in the area." (Exhibit C–12(a)–(d))

22. Appellants' Proposed Special Conditions are virtually identical for each well. (N.T. 30–31; Exhibit C–12(a)–(d))

. . . .

27. When an oil and gas well is "mined around," the Pennsylvania [DEP] requires a pillar which is a block of coal of adequate size around the well to protect the well from damage and prevent gas from migrating into the coal mine. (N.T. 32–33)

. . . .

29. Appellants further proposed requiring that Penneco plug the wells by removing steel casing from boreholes either by pulling it out or by grinding or milling it. (N.T. 36–37, 405, 414, 428–429; Exhibits C–12(a)–(d), A–34)

30. Plugging involves injecting expandable cement into an oil or gas well to prevent the vertical migration of liquids and gases either to the surface or into any ground water or seams of coal penetrated by the well. Well plugging enhances mine safety because it prevents fluid movement into the coal seams. (N.T. 49–50; 58 P.S. § 601.210 and 25 Pa.Code §§ 78.91–78.98)

31. Foundation Coal's objections were the first objections the Pennsylvania [DEP] ever received from a coal company that was neither mining coal nor had even filed a permit to mine coal. (N.T. 34)

. . . .

36. Foundation Coal wanted a deviation survey to be conducted on each of the wells. Foundation Coal requested logging through the coal seams. (N.T. 36)

37. A deviation survey indicates how far off plumb or true vertical the well bore itself is and it would be run from the surface to the bottom of the well to show what the deviation was within that well bore. The logging would be done through the coal seams and would identify them and indicate their thickness. (N.T. 36)

38. Foundation Coal requested that all the casing be removed and milled out if necessary when the well was plugged. (N.T. 36)

39. The Pennsylvania Oil and Gas Act and the regulations under the Act do not mandate removal of steel casing from the borehole. (N.T. 36–37)

40. In Pennsylvania, the coal protective steel casing in wells constructed after 1985 is required to be cemented in place and cannot be pulled or yanked out. (N.T. 36, 79–81, 153; Exhibit C–7; 25 Pa.Code § 78.92)

41. In wells where the coal protective casing is cemented in place it is not necessary to perforate the casing to allow cement to infiltrate the annular space because the cement is already there. (N.T. 79–81)

. . . .

47. In January 2006, Appellants arranged a telephone conference call to discuss their objections with then Pennsylvania [DEP] Secretary Kathleen McGinty and Deputy Secretary J. Scott Roberts. (N.T. 99, 345–346, 351–353)

48. Following the January 2006 conference call and further review of Appellants' Objections and the Proposed Special Permit Conditions, the [DEP] was persuaded that most of the items suggested by Appellants, specifically, well logging, directional surveys and plugging wells for mining through would foster mine safety. (N.T. 37–39, 100, 345–346, 351–353, 366–367)

. . . .

50. The conditions in Penneco's oil and gas permits provide that the coal operator would have access or notice when the wells were being drilled so that it could perform the deviation survey and the logging. Another condition also provided that the coal operator have access to the well when the well was plugged so it could make sure that the well plugging met federal and state mine safety standards. There is nothing set forth in the conditions that would prohibit Foundation Coal from reaching an agreement with Penneco by which Foundation Coal could arrange to have Penneco's wells plugged by milling out the steel casing at Foundation Coal's expense. (N.T. 41)

. . . .

52. Penneco rejected the proposed alternate well locations suggested by Foundation Coal because the alternate locations were very steep sites and it would be very difficult to construct drill pads. One of the locations was also too close to a township road. These determinations were not contradicted by the evidence at the hearing. (N.T. 43)

. . . .

55. Five of the Penneco wells have been drilled. (N.T. 47)

56. The Pennsylvania [DEP's] special permit conditions are silent as to who pays the costs associated with the activity described in the permit conditions. Mr. Janco did not believe that the [DEP] had the authority to specify who will pay these costs. In practice, Foundation Coal has paid the costs as they

requested the conditions which are not required by applicable law. (N.T. 48)

57. The special conditions in the Penneco permit[s] worked because the deviation surveys and logging was conducted. None of these active wells have been plugged and they are still producing wells. (N.T. 48, 71)

. . . .

68. The basic permit to mine coal underground in Pennsylvania is called a Coal Mining Activity Permit. (N.T. 112–113)

69. A typical Pennsylvania longwall underground coal mine encompasses 20,000 to 30,000 acres. (N.T. 113)

70. A Coal Mining Activity Permit (CMAP) does not authorize coal mining throughout the entire CMAP area. Coal extraction is only allowed where a subsidence control plan has been approved by the Pennsylvania [DEP]. These subsidence control plan areas usually allow mining in five year periods. Subsidence control plans contain a great deal of required information. (N.T. 113–114)

71. A longwall coal panel is a large block of coal that is 1,000 to 1,450 feet wide and approximately 15,000 feet in length. The coal company will try to mine nearly all the coal in this block. (N.T. 114)

. . . .

73. The size and orientation of longwall panels sometimes change from what a coal company originally proposes. (N.T. 115)

. . . .

75. In-panel moves are expensive, time consuming, and sometimes potentially dangerous but are performed on a regular basis safely. (N.T. 119)

. . . .

78. An in-panel move is where the panel would stop, the longwall face would stop, the equipment would be removed from that face and it would be repositioned and reset up on the other side of barrier pillars, or protective pillars, to start in the same block of coal. (N.T. 133)

. . . .

114. Mr. Schloemer [Foundation witness] believes two wells—the Orndoff No. 1 and the Porter No. 2 well are within the initial permit area. (N.T. 213)

115. The Braddock wells are within the coal boundary but not within the initial permit area. The Gaines wells are neither in the initial permit area nor within the coal boundary for Foundation Coal's Pittsburgh Seam; but they are within the coal boundary of the Sewickley Seam. (N.T. 213)

. . . .

128. At the time Foundation Coal filed its objections to Penneco's oil and gas well permits, Foundation Coal had not completed any of the modules identified in the application for an underground mining permit. (N.T. 251)

. . . .

158. Penneco responded to the conditions that the coal company wanted and agreed not to object to the conditions issued by the Pennsylvania [DEP]. These permits were unique out of 700 permits issued to Penneco—none of the others had any conditions at all. (N.T. 475)

159. Mr. Jacobs [of Penneco] believes that it is implied in the permit that the coal companies will bear the costs of the conditions. (N.T. 476)

. . . .

163. Mr. Morgan [Penneco's expert] characterized and we find the current

Foundation Coal proposals as a moving target. (N.T. 500)

164. If Foundation Coal changes their plans for a 1,250 foot wide grid to a 1,450 wide foot grid then everything shifts down and everything becomes realigned. (N.T. 501)

165. Much of the detailed permit application work had not been completed at the time of the hearing. (N.T. 502)

. . . .

168. Without detailed maps Foundation Coal can not show that Penneco's wells will unduly interfere with Foundation Coal's mine. (N.T. 507)

. . . .

172. There are a number of encumbrances to the Foundation Coal drawings which preclude it from mining these areas. (N.T. 523)

172. A plat has defined boundaries on it. (N.T. 525)

. . . .

175. Appellants have postulated various sizes and orientations of longwall panels in the maps it has created for the possible future mining in the area of the wells. (N.T. 238; Exhibits A–1 and A–2)

176. If a gas well or oil well is located within a panel, and the well cannot be plugged and mined through in accordance with Pennsylvania and Federal standards and guidelines, it must be mined around. This is accomplished with an in panel move. (N.T. 288)

EHB's Adjudication, issued March 9, 2009, at 17–38.

EHB determined preliminarily that Foundation Coal bore the burden of proving DEP abused its discretion in issuing the permits without the specific conditions requested by Foundation Coal. EHB then discussed the history and evolution of the regulatory framework dealing with coal mining and gas and oil drilling, beginning with our Supreme Court's decision in *Chartiers Block Coal Company v. Mellon,* 152 Pa. 286, 297, 25 A. 597, 599 (1893), in which the court held that an oil and gas operator was allowed to drill through a coal seam to reach its oil and gas reserves and that a court would step in only to prevent any "wanton interference with the coal mining[.]" Subsequently, a "good faith understanding" developed between the coal mining industry and the oil and gas industry, whereby "oil and gas drillers agreed to drill on 1,000 foot centers and the coal mining industry agreed not to challenge the wells if they were spaced at least 1,000 feet apart." EHB's Adjudication at 40. The EHB then went on to discuss how the "agreement" was breached by an oil and gas operator who proposed drilling on less than 1000 foot centers, and which ultimately resulted in this court's decision in *Einsig v. Pennsylvania Mines Corporation,* 69 Pa.Cmwlth. 351, 452 A.2d 558 (1982).

In *Einsig,* we held that "DER's statutory authority under the Act is limited to ascertainment of whether a well can be safely drilled, and, if so, where on the driller's tract of land it can be located where it will least interfere with or endanger the mine." *Id.* at 568. EHB further noted that the *Einsig* decision spawned comprehensive legislation in the form of the Oil and Gas Act and the Coal and Gas Resource Coordination Act, Act of December 18, 1984, P.L. 1069, *as amended,* 58 P.S. §§ 501–518; and that the Environmental Quality Board adopted regulations to implement these statutes.

Finally, EHB also discussed the history of coal mining in Pennsylvania and, specifically, what was meant by "traditional room and pillar mining" versus "longwall mining." EHB's Adjudication at 43. Room and pillar mining leaves pillars of coal in

the mine to support the surface and involves mining rooms off the main entries, which are then supported during the initial phase of mining by coal pillars and artificial roof supports. Longwall mining, in contrast, is a method whereby long panels of coal, often ten thousand or more feet long and 800 to 1550 feet wide, are mined using machines that move back and forth across the face of the coal and shear the coal directly onto conveyor belts which then carry the coal to the surface. Underground coal mining is regulated by The Bituminous Mine Subsidence and Land Conservation Act, Act of April 27, 1966, Sp. Sess. No. 1, P.L. 31, *as amended,* 52 P.S. §§ 1406.1–1406.21, which, notably, makes the coal operator primarily responsible for the safety of its coal mine.

EHB then reached the substantive issues raised by the parties and concluded that the evidence showed that Foundation Coal did not establish that it had a "projected and platted but not yet operating" coal mine as set forth under Section 202 of the Oil and Gas Act. In reaching this conclusion, EHB determined that it was "impossible to establish the boundaries of the proposed Foundation Mine with any type of certainty." EHB's Adjudication at 47. In addition, EHB found that DEP itself did not consider Foundation Mine a projected and platted mine because there was neither a permit to mine nor an application for a coal mining activity permit. Finally, EHB determined that the maps submitted by Foundation Coal as proof were substantially undercut by the testimony of its own witnesses, who testified that the panels shown at 1250 feet wide might be increased to 1450 to 1550 feet wide. Penneco's expert, John Morgan, testified that widening the panels by 200 to 300 feet

would completely realign the Foundation Mine; that the only way to know if a specific Penneco well was going to impact the mine was to have a detailed knowledge as to where the gate roads, tailgates and the beginning and end of each panel in the mine will be located; and that the mining plans were a moving target without the necessary detail to qualify as a projected and platted coal mine. EHB characterized Mr. Morgan as "eminently qualified and articulate" and found him "extremely credible. . . ." EHB's Adjudication at 47–48. EHB held that:

> Based on the regulations and statutes together with a review of the factual evidence we find that until Foundation Coal conducts the detailed engineering and geological investigations required by the [DEP] to complete the various modules in the coal mining activity permits it does not yet have a projected and platted mine. It is one thing for a mining engineer to sit down and plot a conceptual mining plan on a map. It is quite another to do all the work required to meet the regulatory definition of a "platted and projected but not yet operating" coal mine. Since this detailed work will not be done until the filing of a permit application we hold that in order to qualify as a platted and projected but not yet operating mine in order to file objections under Section 202 of the Oil and Gas Act, a coal company, at a minimum, must have filed a technically complete mine permit application.

*Id.* at 48–49.[3]

With respect to whether DEP had abused its discretion in issuing the permits to Penneco without the special

---

**3.** EHB noted that even though Foundation Coal did not qualify to file objections under Section 202 of the Act, it did qualify to have a conference under Section 501 of the Act as a party with a direct interest in the matter, which section is intended to allow conferences for any reason dealing with the subject matter of the Act. *Id.* at 50.

conditions proposed by Foundation Coal, EHB determined that the actions of DEP were reasonable and lawful and that there was no requirement under either Pennsylvania or federal law for the conditions requested by Foundation Coal. EHB found that Foundation Coal failed to show that Penneco's drilling would unduly interfere with or be necessary for the safe operation of its future Foundation Mine. In addition, EHB concluded that DEP lacked the legal authority to impose the special conditions proposed by Foundation Coal in the permits issued to Penneco. EHB stated that there was no statutory provision or regulations that would require an oil and gas operator to provide the coal company with either directional and deviation surveys or logs of the coal seam. With respect to the issue of well plugging, the EHB stated:

> It is thus abundantly clear that the Department was not provided with discretion to substitute different methods of plugging not specifically provided by statute or regulation simply because of expediency and cost efficiency in the name of longwall mining. The legislative and regulatory framework thus clearly addresses the plugging of oil and gas wells in contemplation of subsequent mine-throughs and anticipates that wells may be "mined through" by a coal operator.
>
> . . . .
>
> Penneco's oil and gas wells are likely to produce for 30 to 50 years and possibly more. We do not know what the prevailing statutes and regulations will require at that time. Penneco, like all oil and gas operators, is required to plug its oil and gas wells in accordance with "prevailing law."

EHB's Adjudication at 58–59. EHB denied Foundation Coal's objections and dismissed the consolidated appeals. Foundation Coal has now appealed to this court.[4]

Foundation Coal first argues that EHB erred in holding that the Foundation Mine was not a "projected and platted but not yet being operated" coal mine with standing under Section 202 of the Oil and Gas Act to file objections to Penneco's oil and gas permits. Foundation Coal argues that it was error for EHB to hold that Foundation Coal had to have filed a technically complete permit application to qualify as a "projected and platted but not yet being operated" coal mine before it could file objections under Section 202 of the Act. DEP/Penneco counters that this issue is moot, because Foundation Coal was allowed to proceed under Section 501, which allows any party with an interest in the action to request a conference. In the event that it is necessary for this court to decide the issue of standing, DEP/Penneco argues that Foundation Coal did not have a projected and platted but not yet being operated coal mine as Foundation Coal had not yet filed for a CMAP nor was it operating a mine at the time it filed its objections.

We have held that the Department is empowered to authoritatively interpret environmental regulations and that power is a necessary adjunct of its authority to enforce environmental regulations. *Dep't. of Envtl. Prot. v. N. Am. Refractories Co.,* 791 A.2d 461, 466 (Pa.Cmwlth.2002). In furtherance of this conclusion, we have

---

4. Our review of an EHB order is limited to determining whether the EHB's findings are supported by substantial evidence and whether constitutional violations or errors of law were committed. *Pa. Trout v. Dep't. of Envtl. Prot.,* 863 A.2d 93 (Pa.Cmwlth.2004). A party who objects to DEP's issuance of a permit has the burden to show, on the record produced before the EHB, that issuance of the permit was arbitrary or an abuse of discretion. *Id.* at 105.

also held that the Department's interpretation of environmental regulations is entitled to great deference, unless the Department's interpretation is clearly erroneous.[5] *Id.*

As pointed out by both Penneco and DEP, Foundation Coal was allowed to file its objections under Section 501 and extensive conferences were held in an attempt to negotiate a resolution to the issues, and Foundation Coal had the opportunity to set forth its arguments in favor of the special conditions it was requesting, as though it had standing as a "projected and platted but not yet being operated" coal mine under Section 202(b) of the Act.[6] Moreover, we agree with the EHB's conclusion that Foundation Coal's proposed mine was not yet "projected and platted" within the meaning of the Act.

Mr. Janco, the Regional Manager of the Bureau of Oil and Gas Management for DEP, testified that DEP is still working on the issue of what "projected and platted" means but that ultimately, he believed that "in the final analysis it will be more than [having ownership of a coal interest]." May 21, 2007 Hearing, N.T. at 67. Mr. Morgan, Penneco's expert, testified that the various mine projections he reviewed from Foundation Coal show changes over a period of time that he would call a state of evolving mine planning. Mr. Morgan testified that he had not seen any hydrology studies, an identification of stream protection zones or subsidence protection zones

around Act 54 structures [7] that would give a greater degree of certainty as to what is actually going to happen. Mr. Morgan testified that it was significant, in his opinion, that there were no public filings of any drawings depicting the Foundation Mine, because the purpose of a public filing is to give notice to all parties who may be affected by the mine and to allow communication between the parties to minimize impact on each party. On cross-examination, Mr. Morgan testified:

> I'm saying that to have a projected and platted coal mine, you actually have to have the right to that property which you're projecting the mine through, and I'm saying that there are a number of encumbrances to the drawings [of Foundation Coal's mine] ... which preclude them from being considered a platted coal mine.
>
> . . . .
>
> To have a platted coal mine infers a level of detail, which means it's a viable operation which you have the right to that property ... A plat is a document which has defined boundaries on it, which has defined ownership, which is a fixed document.

May 24, 2007 Hearing, N.T. at 523 and 525. In his opinion, the Foundation Mine was not "projected and platted" as that term is used in Section 202 of the Oil and Gas Act.

---

5. We have, therefore, reversed the EHB where it failed to defer to DEP's interpretation of an environmental regulation that comported with the regulation's plain language and was also consistent with the statute under which the regulations were promulgated. *See Dep't. of Envtl. Res. v. BVER Envtl., Inc.,* 130 Pa.Cmwlth. 344, 568 A.2d 298 (1990).

6. David Janco of DEP testified that it did not matter if DEP gave Foundation Coal a conference under Section 202(b) or Section 501,

because in his opinion, "[t]he same purpose was served." May 21, 2007 Hearing, N.T. at 45.

7. "Act 54" structures are encompassed under The Bituminous Mine Subsidence Act, 52 P.S. § 1406.5d, specifically, subsections (1)—(4), and includes, "commercial, industrial and recreational buildings ... schools, churches and hospitals ... [and certain] agricultural structures ...."

■ In its discussion, EHB found that the requirement of completing as much of the detailed work as possible by filing a technically complete coal mine activity permit was critical to allow a reviewing party to determine whether or even if a proposed oil or gas well of Penneco's unduly interfered with the Foundation Mine. Therefore, EHB concluded, based on the evidence of record: "The mining plans of Foundation Coal introduced at the hearing simply do not contain the necessary detail. The mining maps are a moving target and were not specific enough to constitute a projected and platted coal mine." EHB's Adjudication at 48. We likewise conclude that this is a reasonable interpretation by EHB based on the evidence presented at the hearing and that the EHB did not err in this regard. While we understand the complexities involved in filing a coal mining activity permit application and we acknowledge that Foundation Coal has expended a tremendous amount of time, resources and effort in developing the plans for the Foundation Mine,[8] we do not find any error of law in EHB's determination that in order for a coal owner/operator to be considered as a "projected and platted but not yet operating" coal mine, it had to have filed a "technically complete coal mining application." EHB's Adjudication, Conclusion of Law No. 13 at 67.

Foundation Coal also challenges DEP's decision to issue the permits to Penneco without imposing "reasonable conditions in order to avoid undue interference with or endangerment to [Foundation Coal's] proposed coal mining operation[.]" Foundation Coal's Brief at 4. Foundation Coal argues that under Section 201(e) of the Oil and Gas Act, DEP may impose any conditions as are necessary to ensure compliance with the laws and regulations affecting oil and gas drilling and the issuance of those permits and that the conditions it proposed were necessary to avoid undue interference with its coal mine and to ensure the safety of its mining operations. DEP and Penneco counter that Section 201(e) does not allow DEP to promulgate regulations in the guise of special conditions, regardless of whether the conditions foster mine safety. DEP asserts that the conditions it did include in Penneco's permits allowed Foundation Coal to obtain the deviation and directional surveys and well logs that it was requesting, but that DEP was not authorized to impose obligations upon the oil and gas operator that went beyond assuring compliance with the laws regulating oil and gas drilling, such as requiring that Penneco pay for the surveys and the well logs.

■ In the *de novo* proceeding before the EHB, Foundation Coal, as the "party protesting DEP's issuance of [the] permit[s] ha[d] the burden to show, on the record produced before the EHB, issuance of the permit[s] was arbitrary or was an

---

8. Foundation Coal's Director of Strategic Mine Projects, William Schloemer, testified that the Foundation Mine has been projected and platted since 1999, and since then, Foundation Coal has maintained extensive geologic core drilling and exploration program to verify the location and thickness of the coal seams and to identify any geologic anomalies that might require a change in the projected layout and facilities of the mine. Mr. Schloemer also testified that Foundation Coal began its formal surface property acquisition program in 2001 and that it has expended significant amounts of resources to date. Finally, Mr. Schloemer testified that Foundation Coal has held a number of meetings with DEP to discuss its mine permit application. He admitted that none of the modules required for the permit application have been completed. He stated that, "[t]hey would have to be complete when we file [our mine permit application] in late summer." May 22, 2007 Hearing, N.T. at 207.

abuse of discretion." *Pa. Trout v. Dep't. of Envtl. Prot.*, 863 A.2d 93, 105 (Pa. Cmwlth.2004) (citation omitted). We also note that questions of conflicting evidence, witness credibility, and evidentiary weight are within the exclusive discretion of the EHB as the fact-finding agency, and may not be disturbed on appeal. *Id.* at 104.

Oil and gas drilling is regulated by several statutes, namely, the Coal and Gas Resource Coordination Act, the Oil and Gas Act, and regulations of the Environmental Quality Board at 25 Pa.Code Chapter 78. Under Section 203 of the Oil and Gas Act, 58 P.S. § 601.203(3), as part of registering and identifying a well, an oil and gas operator is required to furnish to DEP, among other things, "[t]he approximate date of the drilling, completion of said well and the approximate depth of said well, the producing horizons, well construction information and driller's logs, if available." Similarly, 25 Pa.Code § 78.122(a)(8)(9), which concerns oil and gas well records and completion data that is to be furnished to DEP, requires that the well operator report the "elevation and total depth" of the well, and that the well operator keep a "[d]rillers log that includes the name and depth of formations from the surface to total depth, depth of oil and gas producing zone, depth of fresh water and brines and source of information." In addition, 25 Pa.Code § 78.123 requires the well operator, upon request of DEP, must furnish copies of electrical, radioactive or other industry logs run on the well "in the ordinary course of business." None of these statutory or regulatory provisions require the well operator to provide directional and deviation surveys or well logs of the coal seams to DEP. This was confirmed by both the Regional Manager of the Bureau of Oil and Gas Management, David Janco, and the Director of the Bureau of Mine Safety, Joseph Sbaffoni.

May 21–24 and June 6, 2007 Hearings, N.T. at 36–38, 565–66.

Chapter 25 of the Pennsylvania Code also sets forth the requirements for plugging a well and includes enhanced requirements for wells that penetrate a coal seam. *See* 25 Pa.Code §§ 78.92–78.93. Section 13 of the Coal and Gas Resource Coordination Act, 58 P.S. § 513, addresses plugging requirements for gas wells that penetrate workable coal seams. Mr. Sbaffoni testified that the Bureau does not require deviation surveys or well logs of coal seams to be performed in order to mine through a plugged well. Nor does the Bureau require milling or grinding out the steel casing if it cannot be removed. Mr. Sbaffoni testified that the Federal Mine Safety and Health Administration (MSHA) requires that the well bore be cleaned out with a diligent effort, but MSHA does not require the milling or grinding out of the steel casing. Mr. Sbaffoni further testified that a mine through of a plugged oil or gas well can be done safely.

■■■ DEP, as an administrative agency, may only exercise those powers vested in it by the General Assembly. *Dep't of Envtl. Resources v. Butler County Mushroom Farm*, 499 Pa. 509, 454 A.2d 1 (1982). An agency also has power from "a strong and necessary implication from" the express statutory language. *PECO Energy Co. v. Pennsylvania Public Utility Commission*, 568 Pa. 39, 46, 791 A.2d 1155, 1159 (2002). Under Section 201 of the Oil and Gas Act, DEP is authorized to issue permits for oil and gas wells. DEP is also authorized to impose conditions in the permits under Section 201(e) of the Act. That subsection specifically provides that, "[t]he department may impose such permit terms and conditions as are necessary to assure compliance with this act and other laws administered by the department." There is nothing in either the laws or the regula-

tions which mandate that deviational and direction surveys or well logging of the coal seam must be conducted by the well permittee as a condition to being issued a permit by DEP to drill an oil or gas well.

EHB concluded that the conditions requested by Foundation Coal were beyond the scope of DEP's authority to impose. Specifically, EHB determined that:

> Foundation Coal is trying to rewrite the Oil and Gas Act under the guise of necessary special conditions to ensure safety in its mine. However, the General Assembly, which has enacted far reaching and comprehensive legislation in this area, never found that what Foundation Coal requested was necessary to ensure safe mining. Moreover, the evidence set forth before this Board at the hearing does not support Foundation Coal's argument that its proposed special permit conditions are necessary to ensure the safe operation of the Foundation Mine.

> In addition, just because something is arguably safer ... does not mean that either the Department or this Board can simply mandate it. This is especially true when the legislature already has enacted statutes directly on point. Special permit conditions were never meant as vehicles to circumvent the law.

EHB's Adjudication at 54–55 (footnote omitted). We agree.

The validity of the requested permit conditions hinges on whether, in DEP's opinion, the conditions "assure compliance with this [Oil and Gas] act or other laws administered by the department." 58 P.S. § 601.201(e). While DEP does not dispute that performing a deviation survey and obtaining a well log fosters mine safety, it correctly points out that there was ample evidence that either mining through a properly plugged well or mining around an unplugged or operating oil or gas well can be and is done safely all the time under the current statutory and regulatory framework. Mr. Sbaffoni testified that as long as the coal operator takes the proper safety precautions, in his opinion, in-panel moves can be done safely. June 6, 2007 Hearing, N.T. at 576–77.

The General Assembly has clearly addressed the issues of plugging and mine-throughs that give definitive guidelines to coal operators who intend to either mine around or mine through a well. Even assuming, arguendo, that DEP has the authority to substitute different methods of plugging not specifically provided by statute or regulation where it has been shown to be necessary for the safe operation of a particular mine, it has no obligation to do so where such necessity has not been shown.[9]

In conclusion, the EHB properly found that DEP did not abuse its discretion by issuing permits to Penneco without the special conditions requested by Foundation Coal. Accordingly, the decision of the EHB is affirmed.

### ORDER

AND NOW, this 27th day of April, 2010, the order of the Environmental Hearing

---

**9.** With respect to grinding away the steel casing in the well bore in the area of the coal seam, EHB found that "[t]he estimated cost of mine through plugs advocated by Foundation Coal is approximately $250,000." EHB's Adjudication, Finding of Fact No. 98 at 29. EHB determined that the conditions that were ultimately included by DEP in the permits issued to Penneco gave Foundation Coal "the ability to undertake the tasks they argue are necessary to ensure the safety of its mine ..." without any obligation to do so. EHB's Adjudication at 55. EHB concluded that since there was no duty under Pennsylvania law to perform the tasks outlined in Foundation Coal's proposed conditions, there was no improper shifting of either duties or costs from the well operator (Penneco) to the coal company (Foundation Coal).

Board in the above captioned-matter is hereby AFFIRMED.

Judge McGINLEY did not participate in the decision in this case.